UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------- X
S.M.N. ISLAM, on behalf of himself and his daughter, S.I.,

                       Plaintiff,

     -against-

POLICE OFFICER ANDREW TIRELLI, SGT. CHRISTIAN RODRIGUEZ, OFFICER JOHN DOES 1-4, and THE CITY OF NEW YORK,

                       Defendants.
----------------------------------------------------------------- X

**MEMORANDUM DECISION AND ORDER**

22-cv-812 (BMC)

**COGAN**, District Judge.

The two defendant police officers and other police officers received radio runs as a result of several 911 calls from witnesses about an ongoing struggle between a man and a girl or woman on the street. When defendants and the other police officers arrived, which was subsequent to the arrival of FDNY EMT ambulance workers, they received conflicting views about what had happened. The victim, who turned out to be plaintiff's runaway teenage daughter, initially denied that plaintiff was her father, and witnesses at the scene told the police that plaintiff had attacked her. After interviewing all of the witnesses, the victim-daughter, and plaintiff, the police officers arrested plaintiff and charged him with endangering the welfare of a child and harassment in the second degree. The entire police participation in the encounter was recorded on six police officer bodycams, collectively totaling hours of footage. Plaintiff was arrested, arraigned, and released, and based on the encounter, has brought false arrest and malicious prosecution claims under 42 U.S.C. § 1983.

Plaintiff has also asserted a First Amendment claim under § 1983 because while plaintiff was shackled at the hospital (having requested to be taken there), he was unable to wash his hands and feet and therefore, he asserts, he was unable to perform his religious duty to pray. But NYPD protocol requires officers to shackle arrestees while receiving medical treatment at hospitals, and plaintiff had already demonstrated at the police precinct that he was permitted to satisfy his religious obligation to pray without preceding it with ritual washing.

It is not clear why any plaintiff's lawyer would bring this action. The Fourth Amendment claim presents a classic case of officers having to make a call in the field about who to believe and who not to believe. The overwhelming weight of the field evidence supported the officers' call. The First Amendment claim is equally without substance as defendants had an obvious legitimate penological objective in keeping plaintiff in shackles at the hospital. Whether plaintiff thinks he is pursuing justice or compensation or both, he should have been talked out of bringing this case because this unfortunate family has enough problems without having to assume the additional burden of non-viable litigation.

## BACKGROUND

### I. The Arrest

About 6:00 one evening, the NYPD received several 911 calls from multiple witnesses reporting an ongoing attempted kidnapping, assault, or harassment at the same location in Queens. The calls described the assailant as a middle eastern or Indian male wearing a white or beige robe and a girl "screaming for help" and "being forced" to go with the assailant.

Defendants, Sgt. Christian Rodriguez and Police Officer Andrew Tirelli, among other police officers, responded to the calls. When they got there, they found an FDNY ambulance

2

with its doors open.  Plaintiff was standing outside of the doors along with other civilians, two FDNY EMTs, and non-party Police Officer Joseph Gauthier.

The bodycam footage shows that as Officer Gauthier approached the ambulance, plaintiff was in an agitated state and was being urged by one of the unidentified civilians to move towards or enter the ambulance where the victim was.  Officer Gauthier told plaintiff multiple times to "get back" while pointing away from the ambulance, but plaintiff continued to move towards the open doors of the ambulance while yelling; Officer Gauthier placed him in handcuffs and moved him away from the ambulance and ultimately to a police car.  As plaintiff was approaching the ambulance, one of the EMTs pointed at plaintiff and said, "this guy attacked her."[1]

When Sgt. Rodriguez arrived at the scene, he spoke with two detectives already there and a civilian witness who identified himself as Mr. Carolan.  Mr. Carolan stated that plaintiff assaulted a girl; was holding her by the throat; and that he (Mr. Carolan) had stepped in to help the girl.  Another EMT told the officers, "they're saying the father over there was assaulting her" and that Mr. Carolan "stepped in to help her out because the father was attacking."  (Mr. Carolan was briefly handcuffed until other witnesses explained to police that he had been trying to prevent plaintiff from assaulting the victim.)

Police officers on the scene spent about 30 minutes speaking with witnesses.  One witness stated that the victim had yelled "help me help me" while plaintiff was dragging her.  Another witness, who identified herself as Malia Leonard on the bodycam, confirmed this and said that others had tried to pull the victim away from plaintiff.  Ms. Leonard, very distraught at

---

[1] Plaintiff purports to dispute this, but Officer Gauthier's bodycam footage shows it clearly. He was firmly directing plaintiff to "get back" while a civilian was urging plaintiff to continue trying to enter into the ambulance, and plaintiff determined to follow the civilian's direction instead of that from Officer Gauthier. It was at that point that Officer Gauthier handcuffed plaintiff.

3

what she had observed of the exchange between plaintiff and the victim, told the police officers that plaintiff had stated he (plaintiff) was "going to stone" the girl while he was dragging her and that he had threatened to "kill her."[2] Crying, she stated that she couldn't stand to see a woman treated that way. Even plaintiff's mother acknowledged that she and plaintiff were "trying to restrain" the daughter and their daughter was yelling "let go of me, let go of me."

Sgt. Rodriguez and an EMT spoke to the victim in the ambulance. She initially denied that plaintiff was her father. She stated that plaintiff had choked her and dragged her by her clothes, and that plaintiff had beaten her in the past. On the way to the hospital, she told Officer Tirelli that plaintiff had grabbed her by the collar, dragged her, choked her, and would not let her go.

At the hospital, Officer Tirelli re-interviewed the victim and took her sworn, handwritten statement on a Domestic Incident Report form (DIR), essentially a criminal complaint, which she then signed with a very distinctive signature. She wrote that plaintiff had trapped her inside of a Dunkin' Donuts and dragged her by her collar, that the victim had asked strangers for help, and that plaintiff was "highly aggressive, loud, and abusive."

## II.     The First Amendment Issue

As noted above, plaintiff was arrested for endangering the welfare of a child and harassment in the second degree. He was transported to the 114th Precinct. He was brought into a room and he asked to be allowed to pray. He testified at his deposition that the officers there were "very helpful to me to take care of my religious [sic] and prayer," and that he was unshackled. He did not ask to wash his hands or feet before praying.

---

[2] Plaintiff concedes the "stone her" remark but not the "kill her" remark. Not that it makes any difference, but again, another one of the bodycams, this one from an Officer Moorish, records the witness relating the "kill her" threat, right at the video location cited in defendants' Rule 56.1 statement.

4

Plaintiff then complained of chest pain and was transported to the hospital. At the hospital, he was placed in leg restraints. In this action, he claims that because of the leg restraints, he could not wash his hands and feet and therefore he was unable to pray.

Plaintiff was arraigned, released, and made no post-arraignment appearances. The case was not indicted and ultimately dismissed under New York's speedy trial statute.

### III.     The Negligence Claim

A few weeks after the incident, plaintiff reported to the police that his 13 year old daughter was having a sexual relationship with a 21 year old male. Two police officers came to plaintiff's house, but advised plaintiff that they could not take a report. The next day, the police called plaintiff to inform him that they had located plaintiff's daughter with the 21 year old male. By the time plaintiff arrived to pick up his daughter, the police had released the 21 year old. The 21 year old continues to have a sexual relationship with plaintiff's daughter. Plaintiff alleges that the police were negligent in refusing to take a report and in releasing the 21 year old when they found him with plaintiff's daughter.

## DISCUSSION

### I.     False Arrest under 42 U.S.C. § 1983

Probable cause is a complete defense both to an action for false arrest and malicious prosecution. See Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996) (citations omitted); Manganiello v. City of New York, 612 F.3d 149, 161-62 (2d Cir. 2010) (quotation omitted). There is a long line of cases stemming from the Second Circuit's decision in Krause v. Bennett, 887 F.2d 362 (2d Cir. 1989), which recognize that when the police have probable cause to make an arrest and are faced with conflicting versions of whether the suspect has a defense, the police officer need not and should not "sit as prosecutor, judge, or jury," even if the facts on which they

5

rely turn out to be wrong or mistaken. See Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994) ("probable cause can exist even where it is based on mistaken information, so long as the arresting officer acted reasonably and in good faith in relying on that information") (quotation omitted)); Palacios v. City of New York, No. 15-cv-386, 2017 WL 4011349, at *9 (S.D.N.Y. Sept. 11, 2017) (finding probable cause for arrest based on warrant that had been vacated unbeknownst to arresting officer). The Supreme Court has held that the proper analysis on a false arrest claim is "whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest." Jaegly v. Couch, 439 F.3d 149, 153 (2d Cir. 2006) (citing Devenpeck v. Alford, 543 U.S. 146, 153 (2004)). "[T]he arresting officer does not have to prove plaintiff's version wrong before arresting him." Curley v. Vill. of Suffern, 268 F.3d 65, 70 (2d Cir. 2001) (citation omitted).

 By my count, based on reviewing the bodycam footage, at least three and probably more witnesses advised Sgt. Rodriguez and Officer Tirelli that plaintiff had attacked the victim. That included a report by one witness that plaintiff had said he was going to stone and kill the victim. It also included a report that the victim was yelling "help me help me" while she was being dragged. It included a report by a bystander who said he attempted to pull plaintiff off of the victim. The victim herself repeatedly told the officers both in the ambulance, on the way to the hospital, and at the hospital that plaintiff had grabbed her, choked her, and refused to let her go. The victim then signed a sworn statement to that effect. The bodycam footage also shows Officer Gauthier telling plaintiff to move away from the ambulance and plaintiff continuing to move towards the ambulance. It is hard to imagine a clearer case of probable cause.

 Plaintiff's efforts to rebut probable cause are insubstantial. First, plaintiff points to the fact that the victim changed her story multiple times and asserts she should therefore not have

6

been credited by the officers. It is true that the victim changed her story multiple times and presented as a confused teenager. That is immaterial. First of all, the first story that the victim told the officers about being attacked was consistent with three or four other disinterested witnesses, and she never changed that part of her story that plaintiff had attempted to drag her.

But more importantly, how common is it in a domestic violence situation for the victim to change her story to absolve her attacker? Police officers are entitled to play it conservatively because if they make a mistake and the victim's first story proves to have been correct, and her subsequent recantation or revision was made out of fear or change of heart, releasing the victim to her assailant could have injurious or even more dire consequences. As this Court noted on very similar facts in Torres v. City of New York, No. 20-cv-4077, 2022 WL 955152, at *4 (E.D.N.Y. March 30, 2022):

> The courts in this Circuit, scientists, and commentators have repeatedly recognized the pressure on domestic violence victims to recant and protest their attackers' innocence and the unreliability of those recantations. See e.g. United States v. Carthen, 681 F.3d 94, 103 (2d Cir. 2012) ("[A] recantation is not unusual in domestic violence cases [because v]ictims of this type of violence often are protective of, and deny allegations against, their abusers."); Haouari v. United States, 510 F.3d 350, 353 (2d Cir. 2007) (a recantation from a victim of domestic violence should be viewed "with the utmost suspicion."); Lindsay C. Malloy et al., Filial Dependency and Recantation of Child Sexual Abuse Allegations, 46 J. Am. Acad. Child Adolesc. Psychiatry 2 (2007) (finding high rates of recantation among substantiated cases of child abuse and recognizing the role of familial pressures to recant); Lisa Marie DeSanctis, Bridging the Gap Between the Rules of Evidence and Justice for Victims of Domestic Violence, 8 Yale J. L. & Feminism, 359, 367-68 (1996) (finding that victims of domestic violence are uncooperative in approximately 80% to 90% of criminal prosecutions).

That is why "[n]either an arrestee's protestations of innocence nor a putative victim's inconsistent statements necessarily vitiate probable cause." Fogelman v. Donato, 111 F. Supp. 3d 282, 285 (E.D.N.Y. 2015) (citation omitted).

Although maintaining that his daughter told the police a "barrage of lies" and so they should not have believed anything she said, plaintiff has submitted an affidavit from his daughter in opposition to defendants' motion. There, she swears, referring to the sworn statement she gave Officer Tirelli in the hospital, that she never saw Officer Tirelli in the hospital; that the statement purporting to bear her signature is not her signature; that she gave him no statement; and she has never seen it before in her life. Ironically, this affidavit, from a witness who plaintiff says the defendants should not have believed, forms the main part of plaintiff's effort to raise an issue of fact on this motion.

But even for purposes of summary judgment, her affidavit has to be disregarded as patently incredible because her highly distinctive signature on the affidavit precisely matches her signature on the DIR that she signed at the hospital. How could Officer Tirelli have obtained and then forged her signature under her handwritten portion of the DIR in which she described what happened to her? To accept the affidavit plaintiff has submitted on this motion, a jury would have to find that that Officer Tirelli somehow obtained plaintiff's signature and added it to her own handwritten statement in the DRI, even though the statement was consistent with at least some of the versions she related on the bodycam.

If plaintiff is offering this affidavit to show that his daughter's story on the bodycam gave rise to doubt about her story that plaintiff attacked her, that is fine, but it does not avoid the fact that other witnesses corroborated that story. If plaintiff, on the other hand, submitted the affidavit to raise an issue of fact as to whether she signed the DRI, no reasonable jury could find in his favor. All the affidavit really does is confirm that this is a broken family in need of counseling.

Plaintiff next argues that there was a prelude to his attempt to restrain the officers and that Sgt. Rodriguez and Officer Tirelli should have weighed that in the balance. According to the verified complaint and plaintiff's deposition testimony, when plaintiff learned that his wife had scheduled a meeting with his daughter, plaintiff called a caseworker from the Administration for Child Services, who instructed plaintiff to go to the police and ask them to meet plaintiff, his wife, and daughter at the agreed meeting location. Plaintiff states that he went to the 114th precinct to request this help. He avers that the police told him to go to the meeting location, and call 911 when he got there. He further avers that he did that, but the police didn't show up until later when bystanders began to call, so that when his daughter began to leave, he had no choice but to restrain her.

Despite discovery, plaintiff has produced no records that he made any such 911 calls, but assuming that he did for purposes of this motion, it is again immaterial. Plaintiff has failed to produce any evidence that Sgt. Rodriguez or Officer Tirelli received radio runs about those calls or even knew of those calls other than plaintiff alleging at the scene that he made them. And in determining probable cause to arrest, it is the information in these officers' possession that matters, not information that they might be able to retrieve through an exhaustive investigation after the fact. See Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 128 (2d Cir. 1997) ("Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." (citations omitted)). Moreover, even if the officers had received knowledge of such calls, it would have merely added to the mix of conflicting information upon which they had to make the judgment call of either releasing the alleged victim to her alleged assailant or detaining her alleged assailant. They made the latter; it was within their discretion to do so.

Finally, plaintiff has submitted an affidavit in opposition from a witness on the scene. The identity of the witness was disclosed to defendants on the eve of the close of discovery, so they had no chance to issue a subpoena and take her deposition. More importantly, the affidavit is almost entirely inadmissible, full of hearsay, argument, opinion, and conclusions to which no witness could testify at trial. To the extent I can glean anything admissible from it, it is that the witness was at the scene before the police arrived; that she observed that the victim was resisting plaintiff's efforts to get her to come home; that this witness joined her father's entreaties to persuade her; that the witness did not see plaintiff choke her, grab her, drag her, or threaten her; and that plaintiff remained "remarkably calm." The witness says she told unidentified police officers that plaintiff was simply trying to retrieve his runaway daughter.

The witness does not state that she spoke to Officer Tirelli or Sgt. Rodriguez. But even if she did, and assuming the truth of the admissible portions of this affidavit, all it does, again, is add to the mix of conflicting information through which the officers had to sort. It does not dissipate probable cause from other witnesses who told them a contrary version.

No reasonable jury could watch these bodycams and conclude anything other than that in the midst of a heated street confrontation, the police were acting professionally, demonstrating restraint, doing their best to figure out what happened, and protect the victim from the risk of violence. Defendants' decision to arrest plaintiff was well supported by probable cause.[3]

## II.    Malicious Prosecution

To establish a claim of malicious prosecution, a plaintiff must prove: "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in

---

[3] Plaintiff asserts that there is an affirmative defense to endangering the welfare of a child when the child is being restrained by a parent, citing N.Y. Penal Law § 35.10(1). But it is well-settled that officers need not exclude the existence of affirmative defenses in determining the existence of probable cause. See Ricciuti, 124 F.3d at 128 (citing Baker v. McCollan, 443 U.S. 137, 145-46 (1979)).

10

plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." Manganiello, 612 F.3d at 161 (internal quotation marks omitted). "[T]he existence of probable cause is a complete defense to a claim of malicious prosecution." Id. at 161-62 (citation omitted).

First, plaintiff has produced no evidence that Sgt. Rodriguez initiated or continued the criminal prosecution of plaintiff. Plaintiff cites to Officer Tirelli's deposition for a contrary conclusion, but his testimony simply does not say that. It merely says that the two defendants conferred and because the victim ultimately disclaimed having been strangled – just dragged by her collar – a charge of criminal obstruction of breathing should not be included. And it was not. Indeed, based on Mr. Carolan's witness statement that plaintiff grabbed the victim around the throat (in which he demonstrated a stranglehold with two hands), there might well have been probable cause to include an obstruction of breathing charge.

Similarly, plaintiff mischaracterizes Officer's Tirelli's testimony as stating that Sgt. Rodriguez "processed" plaintiff's arrest (whatever that means), but Officer Tirelli didn't testify to that either. The question to him was: "At some point, did Sgt. Rodriguez approve of the arrest either in writing or verbal[ly] to you?", to which Officer Tirelli answered, "I believe so, I don't believe specifically." This refers to the arrest, not the prosecution. No reasonable jury could find based on that statement that Sgt. Rodriguez initiated or continued the criminal prosecution of plaintiff or had any role in it at all.

As to Officer Tirelli, who apparently did cause the DIR to be forwarded to the District Attorney for arraignment, plaintiff relies on the victim's affidavit submitted in this motion stating that the DIR is a forgery, *i.e.*, not her statement. As noted above, one need not even look at the bodycams to see the implausibility of this affidavit – the identity of her signature on the DIR and

11

the affidavit she submits here are enough. But when one adds in the bodycams that are largely consistent with the DIR, plaintiff's argument becomes absurd. Nor was there any erosion of probable cause from Officer Tirelli's failure to disclose conflicting statements made by eyewitnesses at the scene. See Savino v. City of New York, 331 F.3d 63, 74-75 (2d Cir. 2003) (dismissing malicious prosecution claim based on allegation that police officer did not report all potentially mitigating circumstances to the Assistant District Attorney); Richards v. City of New York, No. 97-cv-7990, 2003 WL 21036365, at *17 (S.D.N.Y. May 7, 2003) (conflicting eyewitness testimony not sufficient to undermine probable cause). Just as there was probable cause to arrest, there was probable cause to prosecute.

### III. First Amendment Claim

Plaintiff contends that by not removing his shackles in the hospital, a non-party police officer, Officer Chaz Morrish, deprived him of his First Amendment right to practice his religion by washing before praying. "To assess a free exercise claim, a court must determine (1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely held; (2) whether the challenged practice of the [police officers] infringes upon the religious belief; and (3) whether the challenged practice of the [police officers] furthers legitimate penological objectives." Kravitz v. Purcell, 87 F.4th 111, 128 (2d Cir. 2023) (quoting Farid v. Smith, 850 F.2d 917, 926 (2d Cir. 1988)) (cleaned up). There are several problems with plaintiff's First Amendment argument.

First, as mentioned, Officer Morrish is not a party, and plaintiff's request in opposition to defendants' motion to substitute him for a "John Doe" defendant is not properly interposed. It is clear from plaintiff's deposition that he thought the officer's name was "Officer Morris." Defendants had made it clear early in discovery that the correct name was Officer Chaz Morrish;

12

indeed, they even provided the bodycam footage so plaintiff would have no problem recognizing him. Plaintiff made no effort to make the John Doe substitution until six months after the disclosure of Officer Morrish's correct name and the bodycam, and one month after the close of discovery.

Even then, plaintiff never requested leave to file a motion to substitute. Rather, in responding to defendants' premotion conference letter requesting leave to move for summary judgment because plaintiff had failed to identify the officer allegedly responsible for refusing to remove the shackles, plaintiff merely "request[ed] this court grant leave to amend the caption to replace John Doe with Officer Chaz Moorish." Plaintiff repeats that request in opposing defendants' summary judgment motion but, again, there has never been a cross-motion to amend.

The cases are clear that this kind of post-discovery, lackadaisical effort to add defendants who could have been added far earlier is rarely accommodated. See Carlberg v. Loschiavo, No. 12-cv-00887, 2014 WL 5858153, at *3 (D. Conn. Nov. 12, 2014); cf. Watkins v. Doe, No. 04-cv-0138, 2006 WL 648022, at *3 (S.D.N.Y. Mar. 14, 2006) (dismissing without prejudice claims against "John Doe" defendants where "despite having the full opportunity to conduct discovery, plaintiff has not yet identified and served [those] defendants . . . within 120 days of filing the complaint . . . [and] has not sought an extension of the time allowed"). We should not have to reopen discovery at this late stage and Officer Moorish should not have to start defending himself now over an incident that occurred four years ago when plaintiff has had reason to know of his involvement for years. Moreover, because plaintiff never formally moved, nor even sought to move to amend to add Officer Moorish as a defendant in place of a John Doe defendant – instead just making a "request to amend the caption" – in a response to defendants' premotion conference letter – his addition at this point would raise a substantial statute of limitations issue.

13

This is because Rule 15's "relation back" provision only applies to a newly discovered defendant, not the discovery of the name of a defendant who was already present as a John Doe. See Barrow v. Wethersfield Police Dep't, 66 F.3d 466, 470 (2d Cir. 1995), modified, 74 F.3d 1366 (2d Cir. 1996) (per curiam); In re Vitamin C Antitrust Litig., 995 F. Supp. 2d 125, 128-131 (E.D.N.Y. 2014).

In any event, even if I were to add Officer Moorish in the absence of a motion and at this late stage, defendants had a legitimate penological reason for refusing to remove plaintiff's leg restraints. Arrestees, when taken off police premises, have to be placed in restraints. The NYPD manual requires it, see NYPD Patrol Guide Procedure No. 210-01 at 5 ("Leg restraints MUST be used . . . for ALL prisoners being transported to a hospital for medical treatment."); NYD Patrol Guide Procedure No. 210-04 ¶ 21 ("Do not remove handcuffs or leg restraints, unless requested by attending physician." (emphasis in original)), and the legitimate reasons are obvious.

There is also substantial doubt as to whether the shackles burdened plaintiff's ability to pray as he had prayed at the precinct without washing his hands and feet. He now contends that he needed to wash at the hospital because hospitals have water and precincts don't, but of course, precincts have water too.

Plaintiff's First Amendment claim is without merit.

### IV.    Qualified Immunity

A public official is immune from suit unless, *inter alia*, the plaintiff's rights were "clearly established," and it was "objectively unreasonable" for the public official to believe his actions did not violate those rights. Gonzalez v. City of Schenectady, 728 F.3d 149, 154 (2d Cir. 2013). A right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Mullenix v. Luna, 577 U.S. 7, 11

14

(2015) (quotation omitted). To be clearly established, the right must be the subject of Supreme Court, or, in this case, Second Circuit, or New York Court of Appeals decisions that bear some factual analogy to the facts of the instant case, so that the public officials are deemed on at least constructive notice of the parameters of permissible conduct.

If I were not dismissing plaintiff's claims on the merits, I would dismiss them on qualified immunity grounds. Plaintiff's false arrest and malicious prosecution claims devolve into an argument that defendants mis-weighed the evidence of the witnesses on the scene. His defense of his First Amendment claim cites no case holding that a prisoner in a brief detention, hospital or not, must be given water for washing before praying. See White v. Pauly, 580 U.S. 73, 79 (2017) ("While this Court's case law do[es] not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." (quotation marks and quotation omitted)).

V.     **Negligence**

The dismissal of plaintiff's § 1983 claims means that there are no longer any pending federal claims in this action. In that circumstance, when dismissal of federal claims occurs on summary judgment, the "default rule" is that any state law claims should be dismissed without prejudice to refiling in state court. As the Second Circuit has stated, "we have repeatedly said that 'if a plaintiff's federal claims are dismissed before trial, the state law claims should be dismissed as well.'" Oneida Indian Nation of New York v. Madison Cnty., 665 F.3d 408, 437 (2d Cir. 2011) (quoting Brzak v. United Nations, 597 F.3d 107, 113-14 (2d Cir. 2010)).

Plaintiff has not responded to defendants' argument that this Court should decline to exercise supplemental jurisdiction over his negligence claim. I see no reason that to exercise jurisdiction.

15

## CONCLUSION

Defendants' motion for summary judgment is granted and the complaint is dismissed, except for the negligence claim, which is dismissed without prejudice.

**SO ORDERED.**

*Brian M. Cogan*
_____
U.S.D.J.

Dated:  Brooklyn, New York
        October 10, 2024